Acting Secretary, U.S. Department of Homeland Security et al. Mr. Cosco for the appellants. Mr. Press for the appellees. Good morning, Your Honors. May it please the Court, my name is Ron Cosco. I'm the attorney for the appellants. The issue in this case, which I believe is an issue of first impression, is whether, is the following. Post-Kaiser, should the Court give our deference to an agency decision that interprets a precedent decision, that interprets a regulation, that interprets a statute. Tell me again who you're representing. I'm sorry, the appellants? Just one? Muir Lake and the investors. Okay. And any individuals? Yes, we represent all the seven individual investors. So one was not participating in the appeal and one case was remanded because he... Correct. Your brief says you're representing, I'm sorry, I can't pronounce, Sichuan Li? Yes, that's one of the investors. But that investor was dismissed without prejudice and was not in the notice of appeal. Right. Is that person appealing today? The one that was, that one is not appealing. The ones, the remaining ones are appealing. The ones with denial decisions from the USCIS are appealing. The, if I may continue, Your Honors, the issue, this is an interpretation of an... Can I ask you one more question? I'm sorry. Geely, G-E-L-I, appealing or not appealing? That one is appealing. I believe that investor does have a tending petition. There was a filing that says that that investor, who was listed on the notice of appeal, has decided not to pursue this appeal. You know, the underlying question here, have you mixed up the two of them? I don't believe so, Your Honor. Which one, are both of them appealing? Both of the Geely and Sichuan Li, are they both appealing? The investor that still has a pending petition is still appealing. Well, that would be... Together with Miro Lake. Right, so that would be G-E-L-I, except you indicated that he was not appealing. Maybe after we're done here, see if you could send us a note indicating he was actually appealing here. Do you agree that the one who was dismissed without prejudice is not appealing? Correct. Fine. Correct. So the issue involves the deference to be given to the decision when, A, the regulation is not ambiguous, B, the agency provided no analysis of the construction of the regulation and did not conclude it was ambiguous, and C, the agency brought to bear no expertise on the subject matter of the regulation. We would suggest that even before Kaiser, under our, deference should not be given to a precedent decision, which is not a regulation in and of itself. The issue that the denial is based on is whether this is considered an at-risk investment. We would suggest that under any analysis... Well, I mean, if one accepts the regulation and you have not challenged the regulation, the classification of it as debt or equity would be controlling. There's two different regulatory sections. One is the issue of whether this is at risk, and the other is whether this constitutes, quote, a no-bond convertible debt or any other debt arrangement. We believe that the decision itself seemed to focus on the at-risk issue, but whether it's the at-risk issue or whether it's any other debt arrangement, we believe that very clearly it would not, it is at risk under any regulatory definition, and it is not any other debt arrangement under any regulatory definition. And Kaiser requires... Has the agency at any point tried to define any other debt arrangement? No. Well, in matter of Izumi, which is the precedent decision, that's the only attempt the agency has made to define it, but the facts in matter of Izumi have no relevance whatsoever to the facts in this case, and there's actually been no regulatory definition. And you will note that in the decision itself there's no attempt to say what does at-risk mean or what does any other debt arrangement mean. And in matter of Izumi, you had a situation where there was a guaranteed obligation to repay, and if the repayment was made, the investor didn't even have to complete the investment, there was a date certain, there was a certain amount, and matter of Izumi focuses on the fact that it was a guaranteed redemption. There's also a requirement that money be kept in reserve to make the repayment. Right, all of which doesn't apply to this. In fact, this is the exact opposite of that, because far from the money being in reserve, this says that some date in the future, which may be eight years, may be 20 years, if there is more than $3.5 million of available cash in that entity, then the investor has a one-time option to request liquidation of his investment. And that's nowhere near what matter of Izumi is. So we suggest that under Kaiser, the first step of the analysis has to be, under any regulatory construction, what is the definition of at-risk? Is it ambiguous? If it's not ambiguous, then the court makes a decision. What is the definition of any other debt arrangement? It doesn't stand by itself. It doesn't say any debt arrangement. It gives specific examples. Under astutium generis, the any other debt arrangement has to be similar in kind to the note, the bond, or the convertible debt. So in this case, we would suggest that under any definition, this would not be considered anything but an at-risk investment. The courts have looked to the IRS. There's a PepsiCo decision of the IRS. It lists 13 factors that go with this. I guess I had read the risk provision of the regulation as being a further sort of definition of what debt means, and so that the government would have to establish, forget about who has the burden of proof, that it wasn't at risk. Is there something more to it than that? No. Isn't your argument just that it's unreasonable to conclude that this wasn't at risk? Totally. So all the other stuff about Kaiser and everything is really quite irrelevant.  I believe that's correct. Is it reasonable to say the money is not at risk? Yeah. And is it reasonable to say that this qualifies as any other debt arrangement? And the point I was making is that if the court needs to establish some authority, then courts have generally looked to the PepsiCo decision of the tax court that lists 13 factors that go into whether it is debt or equity, and we cited this in the brief. And 13 of the 13 factors in this particular case would point to this being equity and not debt. So I think that there's also it's relevant that Kaiser does talk about the fact that if we're going to give any deference whatsoever to the agency, then the issue is does the agency bring any expertise to the subject matter. And it is not only us saying that the agency brings no expertise, the U.S. Immigration Service has no expertise on what is a debt arrangement, has no expertise on what's an investment at risk. It's not only us saying that. It's the Office of Inspector General of the Department of Homeland Security, and we cited this in our brief. And if I could indulge the court just for a second because I think it's important. Before you indulge us, sir, I still want to get focused on the question I was asking before. As I read the agency's opinions, it's all about whether this is at risk or not, not whether it's debt or not, as if debt were something different than risk. Is there something else about this? I agree. The agency decision itself only focuses on capital at risk. Correct. And they conclude that the capital was not at risk. Correct. I think what we have here is the government's briefing. Well, the government's briefing is really not relevant. I agree. The only issue is what did the agency say? And the agency only said that this does not qualify as an at-risk investment. Yeah. And what I was getting at is the issue of agency expertise, to the extent the court believes that there's even an issue here of whether this is an at-risk investment. We would suggest this is about as risky an investment as one could make. Now, the investors have some potential return. They're going to be a part owner of a business that may make a lot of money. But they're investing, as the documents indicate, before the significant need for debt financing, and they invested before there was any bank commitment. There was a need for government permits, and they invested before there were government permits. The option is based on the assumption that there's available cash. And available cash is not something that says is it profitable or not, but how much cash on hand? Is there at a specific date, at some unknown date in the future? And we would certainly suggest that under any possible definition, this is an investment that is at risk. I think it's important to give you a quick quotation, both from the Office of Inspector General of the Department of Homeland Security and the U.S. Immigration Service. Am I in my rebuttal time? You have three minutes and 54 seconds left. You can choose how you'd like to spend that time. You might want to reserve it for your rebuttal. We'll reserve it for it. Yeah, thank you. Not to be picky about the seconds, but it's staring me right in the face. Thank you. Thank you, Your Honors. Joshua Press from the Department of Justice on behalf of the defendants at Ely's. You have to talk a little louder, or else raise the... I apologize. Is this better? Yeah. Usually I have no problem projecting. So the first thing I'd like to start with is that this case is not about asking for any sort of deference to the instant denial in this matter. This is, if you look at the district court opinion, really a straightforward application of this denial. I think, as Judge Rowland, you were getting at, it starts off with the at-risk analysis. The question is whether it's reasonable to conclude that this was not at risk, right? Well, I'm not sure I would put it like that, because I think, as Your Honors, prior question in that portion of the argument I was getting at, is that the at-risk provision within J2 of 204.6 is tied into directly with the definitional assessment of what it means to invest. And let me be a little clearer if I might. If you look at 204.6 J2... No, what I really want to do is look at the agency's reasoning. That's fair. Where does the agency say anything other than they've concluded that it's not at risk, and that's why they're deciding? So in the joint appendix, this portion here that you're getting at here where they're talking about J2, it's correct that on JA86, they title it capital at risk. That's portion one. And then the very next portion of that is subpart A, guaranteed return of capital, where they get it to the matter of a ZMI analysis. Yes, I understand. But the point I take it is that if it's a guaranteed return of capital, the word guaranteed means there's no risk. Is that right? Or is that something else? Well, I think that the part about this is not just the words at risk, but the remainder of the portion within J2 where it's at risk for the purpose of generating a return on the capital placed at risk. That is exactly why the agency, and that's the more fuller context of what's going on in the matter of a ZMI analysis. It explains why to the agency these are hand-in-glove provisions. Before we get to the ZMI, the argument of your opponent is that they are at risk because they depend on there being a positive cash flow at the time. Of course. Is that right? Yes. Okay. Now your brief is relevant. Can you point to me where in your brief you discuss the words cash flow anywhere? I have to say I did a word search, and I don't see you discussing cash flow, and that seems to be the whole point of your opponent's case, that the risk depends on whether there's cash flow. That's their argument. Well, so that is effectively their argument in terms of how they try to differentiate the ZMI per se from the facts that were at play in ZMI. However, that argument is no different than the argument that was presented to the Ninth Circuit in RLILB. I know, but we are not the Ninth Circuit. I understand that. We're here, and just to be clear, make sure I understand. You and I both understand your opponent's position to be that they are at risk because they don't get their money back unless there's positive cash flow at the moment they want it back, right? In the sense of if any company fails, then no one gets anything. Not in the sense of if any company fails, because companies don't necessarily fail just because they don't have positive cash flow. And companies that do have positive cash flow sometimes fail. So that's not the same thing. They are the whole point of their argument is that the fact that it's contingent on cash flow makes it at risk. That is their argument. I don't know. You may disagree with their argument, but that's their argument, isn't it? I think that's the crux of their argument to the point that there is risk involved, but there is no risk for the purpose of generating capital on that capital. So why do you not address this question at all? I'm very confused. So I apologize for the poor addressmanship. I'm wondering whether it's an addressmanship question or whether you're skipping that issue to get to a different issue. No, we're not. The point there was that we read that language in the operating agreement as effective, and the agency read it this way, was that really that is masquerading for the purpose of if it's a going concern but it's not underwater, then there's risk involved. If the company gets underwater, then no one gets anything, and so all of the investors won't be able to get any sort of return. I'm sorry. You're not denying the proposition that from the point of view of the investors, the cash flow provision adds an element of risk that would not otherwise be there. Correct. What we're saying is it wouldn't otherwise be there. It's not enough. It is not enough. Because that argument was presented in a zooming. It was presented. Was there a cash flow argument that zoomed in? Not cash flow per se, but there was an argument. Was there a contingency of base? In that case, there was a guarantee of return, right? And a requirement that says. And it could have come from the loan. So obviously the facts there were better for the purposes of this argument. However, I do think that the analysis by a zooming is directly off. Because it's essentially sort of having companies tie one hand behind their back where they have to look out for this. And that was the purposive approach that the agency took in 1998. That was sort of that and the tying the benefit to the immigration, well, tying the put option to the immigration benefit was the crux of the agency's reasoning there. And that's what Judge Hogan was looking at below here to basically say. So in a zooming, the agency says maybe six or seven or eight or nine times. The problem addressed here is that the annual returns are guaranteed. The Petitioner states the Service Administration case law exists according to the Petitioner's application of a guaranteed annual return. It says, even if the Petitioner is obligated to make the balloon payment, it still cannot be said to be at risk because it is guaranteed to be returned regardless of the success or failure of the business. This constitutes a straight loan. That's not what this case is. So that's obviously a more egregious scenario here, but I think the agency is confronted with a continuum. And what is equity versus what is debt is not always clear. So then you would have to explain to us why making the paid-in capital dependent on positive cash flow means it's not at risk. But I don't see that analysis in the brief. Well, I think the analysis that we used there was that the purposive approach of the company trying to generate capital, which is language in the Justice Department, believes in purposivism, not textualism, purposivism. So I'm not sure exactly, and I'm not in the business of saying what the Justice Department believes when it comes to purposivism. No, by believes, that is. Because they, with respect to the construction of regulations, they follow a purposivist approach, not a textualist approach. I think that would depend on the language of the statute and regulations involved in the case. And that's what we have here. I think from everything since the inception of this statute and this program, it has always been about genuine investments. That's clear in the legislative history. I don't see how it can be about genuine investments. The agency, in its wisdom, moved away from the statutory term invest and created a whole new classification, debt and equity. So it's certainly something different from plain investment, right? That would be the case if the agency simply followed the statute and perhaps had some elaboration on the concept of investment. The agency threw away the statutory term and replaced it with two others. So I disagree with the premise that the agency threw away the statutory term. I don't think that that's a good thing. So are you arguing seriously that debt is not an investment? I think I'm arguing seriously that the purpose of this program has never been to create basically a debt holding cell for wealthy individuals to obtain a path to citizenship as long as they can put their money into a company for five years. And the statutory term investment or to invest, I take your Honor's point, it has an extremely broad number of interpretations and iterations. I think financial history bears that out. I think the Congress also knew that, and they delegated to the agency the ability to define what sort of investments were actually legitimate investments. Well, we have to assume that because the petitioners did not challenge the regulation. But we still have the regulation. Correct. And you seem to be asking us to carry the language of the regulation vastly farther than the regulation the language would support. So I disagree with that. Let me tell you why straightforwardly. If you look at 204.6J2, which I think is the at-risk analysis, and then it speaks directly to invest. It keeps going to what is an investment. All of that goes to what is the definition of investment, which really we kind of keep coming back to. In 204.6E, there is the provision of debt arrangement because I think the agency's position, and this was promulgated from 91, very close to the actual promulgation of the statute, has been that investment is not about dropping your money and holding it into a company for five years and then pulling out. They took investment to be equity stakeholders who would be interested in both the operation of the company and helping the company flourish. So why isn't an investor who doesn't get his money back unless there's positive cash flow interested in helping the company? Well, I think that if they have contractual provisions in there that are much more akin to the company has to buy it back from me as soon as I'm done with this whole green card process. That's not what it says. It says the company has to buy it back from me if there's positive cash flow. That's the part I don't understand why we're avoiding. That's the key contractual provision that they've cited. Why doesn't the contingency of positive cash flow constitute risk? What's the answer to that? I think that's a risk that any business takes. It's not a risk of actually generating capital per se. Well, normally you don't get your stock back. You don't get your stock back if the company fails. That's what happens. But a company with not positive cash flow in any particular year doesn't necessarily fail. Right. I think you keep going. I understand that. I think that the difference here is that if they're structured in this way, then they're not meeting the purpose that Congress had in mind when they enacted this program and that the agency had in mind when they were putting forward 204.6 since 1991. And if you look at the history of the petitions from 1992 upwards, it started as a very slow program. There was a tripling in terms of demand onto the program. The agency, when they promulgated the four presidential decisions, including Azumi, they were essentially responding to a whole host of more exotic operating agreements and agreements that were being structured with so-called magic words to basically hide. You seem to be suggesting that this move was designed simply to cut what the agency regarded as excessive immigration. No. It's designed to cut more exotic debt arrangements, which is the language. But is exoticism, I'm not sure what that means. It doesn't sound all that exotic. But anyway, does that correlate with absence of risk? I think that debt arrangements do correlate to a certain degree from a perpetrator's standpoint or substantial evidence standpoint to an absence of risk in the sense of they're not put there to generate capital on the return. They're put there to dump the money into an account and then take it out as soon as possible. You can't dump the money. You put somebody in and there are limited circumstances under which you can get it back. So that would be true across the board. So using the verb dump doesn't help. I think a loan with no interest is not the same thing as an equity stake or stock into a company where you're incentivized to actually help. But they're not identical. There's no question about that. But the question is whether this investment is at risk. Well, I think that's the question from the 204.6J2 analysis, omitting the 204.6E provision defining investment. And both actually do contemplate an emphasis on generating capital rather than simply generating risk. So this is never defined, right? Debt arrangement is not defined. The ZUMI is getting to that definition. The question I have is does it really add anything? I don't think that it does anything. Let me correct that. If you look at the list, the laundry list, it begins with things that are very clear-cut forms of debt, bonds, notes, promissory notes, et cetera. And then it goes from that list to also in the agency's wisdom. They know that there will be other forms of more exotic debt packages or financial instruments in the future that they could not contemplate in 1881. Financial history has borne that out. So you're saying what that was aimed at was getting at debt arrangements not listed but which have features similar to the ones which were listed, particularly presumably a lower level of risk. Well, I think that does tie into the analysis. That takes us back to J2, right? I'm not sure it's all about J2. I think the at-risk and 204.6E, the definition of investment, are meant to work together. Because the statutory language, as your Honor was pointing out, was the word invest. I appreciate that's your argument. Is that the argument that the agency made in its denial? The sentence that I read in the denial is, because this constitutes a debt arrangement, capital invested in exchange for redemption agreement is not properly invested and is not at risk. That's at J66. That sounds like the agency is, at least for purposes of this case, defining debt In the very next paragraph, they end with a citation of 204.6E, which is the definition of investment. We're on different pages. I'm on J66. What page are you on? Oh, I'm sorry. That's okay. There's no reason I didn't tell you the page, so there's nothing to be sorry about. Okay. What page? What page are you on? I was on 86 there.  It's page 6 of the denial. It's JA66, I think. Well, I think on that page, they do discuss matter of assuming, which is talking about both of these provisions. I think from the agency's perspective. Their interpretation of matter of assuming seems to be it's about the question of whether it's at risk. They think that the redemption agreement in assuming was not at risk, which is correct. It wasn't. It was guaranteed. But because of the guarantee. Right. Exactly. But there were other. Well, there were other things, including what appears to be a Ponzi scheme. Because in Azumi, they say, well, if they couldn't get their money back one way, they could take more loans from new investors and pay the money back. That's what Azumi says. That's the definition of a Ponzi scheme. No wonder they didn't approve it. That decision actually has a host of reasons, besides even Your Honor's point of this was a scheme. But I think the agency has always looked at that of getting to the point behind both 204.6E's definition and 204.6J2. And they want to gauge the purpose of that. It's not just bound to the Ponzi scheme example that the agency presented. Okay. I think we're over time. Any more questions?  Are we over time? Okay. There you go. Your Honors, I certainly agree that the government's position is the position assuming that the documents did not mention available cash flow. That's a whole different case, and that's not the case we have. In addition to the fact that available cash flow in itself makes the investment, quote, at risk, we add various things to it. The date that it can be exercised is uncertain. It can only be exercised on one date, whenever that is. And it's not like if they ever have available cash flow. It's whether they have available cash flow on that date. And it's not just available cash flow, but there has to be more than $3.5 million of available cash flow, because available cash flow is defined as excluding the $3.5 million that was invested by EB-5 investors. If that's not at risk, I have no idea what is. I think it's also important to look at what the impact would be. If somehow this Court is stating and the Immigration Service is stating that this is a debt arrangement and not at risk, for all other purposes, for all other government agencies, this is clearly equity. For tax purposes, it's clearly equity. The other creditors would certainly be very surprised to learn that all of these people are creditors in line with them. So it's not just looking at this in isolation. This has impact on every other way that this would be treated. If it's treated as debt and not at risk, do the investors still have a right to vote, which is provided to them? Do they still have a percentage of the profits, which is provided to them? So under any possible definition, we suggest that this is an at-risk investment. Any other issues that Your Honor has, Your Honors have? No. Thank you very much. Thank you. We'll take the matter under submission.
judges: Garland, Henderson, Williams